EXHIBIT "B"

# COMMERCIAL AGREEMENT

BETWEEN

## THE PHILADELPHIA DIVISION

OF THE

## PENN-DEL-JERSEY CHAPTER, N.E.C.A.

AND

## LOCAL UNION 98



# INTERNATIONAL BROTHERHOOD
# OF
# ELECTRICAL WORKERS
# PHILADELPHIA, PENNSYLVANIA

**BUSINESS OFFICE**
1701 SPRING GARDEN STREET
PHILADELPHIA, PA 19130
PHONE: (215) 563-5592
FAX: (215) 561-2168

**FINANCIAL OFFICE**
1719 SPRING GARDEN STREET
PHILADELPHIA, PA 19130
PHONE: (215) 563-8991
FAX: (215) 563-9149

# TABLE OF CONTENTS

ARTICLE I
EFFECTIVE DATE - CHANGES - TERM OF THE AGREEMENT ................................................. 1

ARTICLE II
EMPLOYERS' REQUIREMENTS AND RIGHTS ............................................................. 2

ARTICLE III
CONTRIBUTIONS & PAYROLL DEDUCTIONS ............................................................. 7

ARTICLE IV
WAGES AND HOURS ................................................................................................ 11

ARTICLE V
GENERAL ................................................................................................................ 14

ARTICLE VI
STANDARD INSIDE APPRENTICESHIP LANGUAGE ................................................. 15

ARTICLE VII
NATIONAL LABOR MANAGEMENT COOPERATION COMMITTEE ............................ 18

ARTICLE VIII
PRODUCTIVITY, JOB ASSIGNMENT AND SCOPE FOR IBEW LOCAL 98 COMMERCIAL
AGREEMENT ........................................................................................................... 19

INDIVIDUAL LETTER OF ASSENT-A ........................................................................ 22

SEPARABILITY CLAUSE ........................................................................................... 23

APPENDIX A
WAGE RATES ........................................................................................................... 24

GEOGRAPHICAL JURISDICTIONAL LINES OF LOCAL UNION 98, IBEW .................. 25

<u>COMMERCIAL AGREEMENT</u>

Agreement by and between the Philadelphia Division of the Penn-Del-Jersey Chapter, NECA and Local Union 98 of the International Brotherhood of Electrical Workers.

It shall apply to all firms who sign a Letter of Assent to be bound by the terms of this Agreement.

As used hereinafter in this Agreement, the term "Chapter" shall mean the Philadelphia Division of the "Penn-Del-Jersey Chapter, NECA and the term "Union" shall mean Local Union 98 of the International Brotherhood of Electrical Workers.

The term "Employer" shall mean an individual firm who has been recognized by an assent to this Agreement.

<u>BASIC PRINCIPLES</u>

The Employers and the Union have a common and sympathetic interest in the Electrical Industry. Therefore, a working system and harmonious relations are necessary to improve the relationship between the Employer, the Union, and the Public. Progress in the industry demands a mutuality of confidence between the Employer and the Union. All will benefit by continuous peace and by adjusting any differences by rational, common sense methods. Now, therefore, in consideration of the mutual promises and Agreement herein contained, the parties hereto agree as follows:

The parties to this Agreement agree not to discriminate against any member because of race, creed, color, sex, religion, age or national origin.

<u>ARTICLE I</u>

<u>EFFECTIVE DATE - CHANGES - TERM OF THE AGREEMENT</u>

**SECTION 1.01**  This Agreement shall take effect April 28, 2003 and shall remain in effect until April 20, 2006 unless specifically provided for herein. It shall continue in effect from year to year thereafter, from May 1st through April 20th of each year, unless changed or terminated in the way later provided herein.

**SECTION 1.02**  (a) Either party or an employer withdrawing representation from the Chapter or not represented by the Chapter, desiring to change or terminate this Agreement, must provide written notification at least 90 days prior to the expiration date of the Agreement or any anniversary date occurring thereafter.

(b) Whenever notice is given for changes, the nature of the changes desired must be specified in the notice, or no later than the first negotiating meeting unless mutually agreed otherwise.

(c) The existing provisions of the Agreement, including this Article, shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

(d) In the event that either party, or an Employer withdrawing representation from the Chapter or not represented by the Chapter, has given a timely notice of proposed changes and an agreement has not been reached by the expiration date or by any subsequent anniversary date to renew, modify, or extend this Agreement, or to submit the unresolved issues to the Council on Industrial Relations, for the Electrical Contracting Industry (CIR) either party or such an employer, may serve the other a ten (10) day written notice terminating this Agreement. The terms and conditions of this Agreement shall remain in full force and effect until the expiration of the ten (10) day period.

(e) By mutual agreement only, the Chapter, or an Employer withdrawing representation from the Chapter or not represented by the Chapter, may jointly with the Union, submit the unresolved issues to the

1

Council on Industrial Relations for the Electrical Contracting Industry for adjudication. Such unresolved issues shall be submitted no later than the next regular meeting of the Council following the expiration date of this Agreement or any subsequent anniversary date. The Council's decisions shall be final and binding.

(f) When a case has been submitted to the Council, it shall be the responsibility of the negotiating committee to continue to meet weekly in an effort to reach a settlement on the local level prior to the meeting of the Council.

(g) Notice of a desire to terminate this Agreement shall be handled in the same manner as a proposed change.

**SECTION 1.03**  This Agreement shall be subject to change or supplement at any time by mutual consent of the parties hereto. Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, the same as this Agreement.

**SECTION 1.04**  During the term of this Agreement, there shall be no stoppage of work either by strike or lockout because of any proposed changes in this Agreement or dispute over matters relating to this Agreement. All such matters must be handled as stated herein.

**SECTION 1.05**  There shall be a Labor-Management Committee of three (3) representing the Union and three (3) representing the Employers. It shall meet regularly at such stated times as it may decide. However, it shall also meet within forty-eight (48) hours when notice is given by either party. It shall select its own Chairman and Secretary. The Local Union shall select the Union representatives and the Chapter shall select the management representatives.

**SECTION 1.06**  All grievances or questions in dispute shall be adjusted by the duly authorized representatives of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within forty-eight (48) hours, they shall refer the same to the Labor-Management Committee.

**SECTION 1.07**  All matters coming before the Labor-Management Committee shall be decided by a majority vote. Four (4) members of the Committee, two (2) from each of the parties hereto, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of its membership and it shall be counted as though all were present and voting.

**SECTION 1.08**  Should the Labor-Management Committee fail to agree or to adjust any matter, such shall then be referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication. The council's decisions shall be final and binding.

**SECTION 1.09**  When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matters arose shall not be changed or abrogated until agreement has been reached or a ruling has been made.

<u>**ARTICLE II**</u>

<u>**EMPLOYERS' REQUIREMENTS AND RIGHTS**</u>

**SECTION 2.01**  (a) No member of Local Union 98, while he remains a member of such Local and subject to employment by Employers operating under this Agreement shall himself become a contractor for the performance of any electrical work.

(b) Journeyman electricians or apprentices shall not work for Employers who are not parties to this Agreement or a separate Agreement containing the same terms as this Agreement. This does not apply

2

to work performed under the terms of International Agreements or to regular maintenance work, or to an authorized salting program.

**SECTION 2.02**  (a) It is agreed that an Employer is a person, firm or corporation employing at least (1) journeyman continuously, who contracts to perform electrical work, or who has a bona-fide department for maintenance of an electrical installation.

(b) Maintains a permanent place of business with a business telephone, both open to the public during regular business hours. This place of business shall not be part of a domestic establishment.

(c) Maintains a financial status suitable to meet all anticipated payroll requirements, including withheld Municipal, State and Federal taxes.

(d) The following bond provisions are effective July 1, 2003 for all existing contractors working in Local 98's jurisdiction and effective April 28, 2003 for all new contractors. Every Employer who employs at least one (1) member of the Union shall be obligated to provide a surety bond, with an acceptable surety company, authorized to do business in Pennsylvania on a form furnished by the Local Union in accordance with the following scale in the amount of fifty thousand dollars ($50,000.00), such bond to be used for the purpose of guaranteeing proper payment of all wages that may be due and owing to members employed under the collective bargaining agreement and to guarantee proper payment of all contributions due and owing to the Union (for dues and assessments), the Welfare Fund, the Pension Fund, the Deferred Income Fund, the Vacation Fund, the N.E.B.F. the Political Action Fund, the Market Recovery Fund and any other amount required by this labor contract to be submitted as an employer contribution (or dues check off amount) to the Union, with a copy to the Association, and an additional copy shall be forwarded to the Administrator of the Local 98 Benefit Fund(s).

The amount(s) of the surety bond referenced in the preceding paragraph shall be increased automatically and all affected Employers shall automatically and immediately increase the level of the surety bond, in the following circumstances:

(1)  When an Employer's monthly contribution obligation(s), in the aggregate, to the various Local 98 employee Benefit Funds referenced in this labor agreement exceeds a level of fifty thousand dollars ($50,000) but not more than one hundred thousand dollars ($100,000) for a month, the employer shall increase the amount of its surety bond to the sum of one hundred twenty-five thousand dollars ($125,000). When the Employer's monthly contribution obligation(s), in the aggregate, drop below fifty thousand dollars ($50,000) per month for two consecutive months and if the Employer is current on all financial obligations to the Local, the Trust Funds, and it's members, the employer may reduce the amount of its surety bond to fifty thousand dollars ($50,000).

(2)  When an Employer's monthly contribution obligation(s), in the aggregate, to the various Local 98 employee Benefit Funds referenced in this labor agreement exceeds a level of one hundred thousand dollars ($100,000) but not more than one hundred fifty thousand dollars ($150,000) for a month, the employer shall increase the amount of its surety bond to the sum of two hundred fifty thousand dollars ($250,000). When the Employer's monthly contribution obligations, in the aggregate, drop below one hundred thousand dollars ($100,000) per month for two consecutive months and if the Employer is current on all financial obligations to the Local, the Trust Funds and its members, the employer may reduce the amount of its surety bond to the amount required by 2.02(d) or 2.02(d)(1) above.

(3)  When an Employer's monthly contribution obligation(s), in the aggregate, to the various Local 98 employee Benefit Funds referenced in this labor agreement exceeds a level of one hundred fifty thousand dollars ($150,000) but not more than two hundred thousand dollars ($200,000) for a month, the Employer shall increase the amount of its surety bond to the sum of three hundred seventy-five thousand dollars ($375,000). When the Employer's monthly contribution obligations, in the aggregate, drop below one hundred fifty thousand dollars ($150,000) per month for two consecutive months and if the Employer is

3

current on all financial obligations to the Local, the Trust Funds and its members, the employer may reduce the amount of its surety bond to the amount required by 2.02(d), 2.02(d)(1), or 2.02(d)(2) above.

(4)   When an Employer's monthly contribution obligation(s), in the aggregate, to the various Local 98 employee Benefit Funds referenced in this labor agreement exceeds a level of two hundred thousand dollars ($200,000) but not more than three hundred thousand dollars ($300,000) for a month, the Employer shall increase the amount of its surety bond to the sum of five hundred thousand dollars ($500,000). When the Employer's monthly contribution obligation(s), in the aggregate, drop below two hundred thousand dollars ($200,000) per month for two consecutive months and if the Employer is current on all financial obligations to the Local, the Trust Funds and its members, the employer may reduce the amount of its surety bond to the amount required by 2.02(d), 2.02(d)(1), 2.02(d)(2) or 2.02(d)(3) above.

(5)   When an Employer's monthly contribution obligation(s), in the aggregate, to the various Local 98 employee Benefit Funds referenced in this labor agreement exceeds a level of three hundred thousand dollars ($300,000) but not more than five hundred thousand dollars ($500,000) for a month, the Employer shall increase the amount of its surety bond to the sum of seven hundred fifty thousand dollars ($750,000). When the Employer's monthly contribution obligation(s), in the aggregate, drop below three hundred thousand dollars ($300,000) per month for two consecutive months and if the Employer is current on all financial obligations to the Local, the Trust Funds and its members, the employer may reduce the amount of its surety bond to the amount required by 2.02(d), 2.02(d)(1), 2.02(d)(2), 2.02(d)(3) or 2.02(d)(4) above.

(6)   When an Employer's monthly contribution obligation(s), in the aggregate, to the various Local 98 employee Benefit Funds referenced in this labor agreement exceeds a level of five hundred thousand dollars ($500,000) but not more than eight hundred thousand dollars ($800,000) for a month, the Employer shall increase the amount of its surety bond to the sum of one million two hundred fifty thousand dollars ($1,250,000). When the Employer's monthly contribution obligation(s), in the aggregate, drop below five hundred thousand dollars ($500,000) per month for two consecutive months and if the Employer is current on all financial obligations to the Local, the Trust Funds and its members, the employer may reduce the amount of its surety bond to the amount required by 2.02(d), 2.02(d)(1), 2.02(d)(2), 2.02(d)(3), 2.02(d)(4) or 2.02(d)(5) above.

(7)   When an Employer's monthly contribution obligation(s), in the aggregate, to the various Local 98 employee Benefit Funds referenced in this labor agreement exceeds a level of eight hundred thousand dollars ($800,000) for a month, the Employer shall increase the amount of its surety bond to the sum of one and seven tenths times the monthly obligation.  When the Employer's monthly contribution obligation(s), in the aggregate, drop below eight hundred thousand dollars ($800,000) per month for two consecutive months and if the Employer is current on all financial obligations to the Local, the Trust Funds and its members, the employer may reduce the amount of its surety bond to the amount required by 2.02(d), 2.02(d)(1), 2.02(d)(2), 2.02(d)(3), 2.02(d)(4), 2.02(d)(5) or 2.02(d)(6) above.

SECTION 2.03   (a)  All Employees who are members of the Union on the effective date of this Agreement shall be required to remain members of the Union as a condition of employment during the term of this Agreement.  New Employees shall be required to become and remain members of the Union as condition of employment from and after the eighth (8th) day following the dates of their employment, or the effective date of this Agreement whichever is later.  This shall not apply to seasonal help.

(b)  The Employer agrees that the Union has the right to discipline its members for violation of its laws, rules and agreements.

(c)  The Employer agrees to notify the Business Manager of the Union on forms furnished by the Union, of the receipt of all contracts secured within its jurisdiction.

4

(d) The Employer agrees to furnish monthly to the Union reports listing the names of the members of the Union employed, number of hours of employment and the gross earnings of each. In the event no members of the Union are employed in any month, reports shall be filed stating that fact. These reports shall be made available to the Labor-Management Committee.

(e) It shall not be a violation of this Agreement, and it shall not be cause for discharge or any other disciplinary action by the Employer against any Employee, for an Employee to refuse to cross a lawfully established primary picket line, whether at the premises of another Employer or the Employee's own Employer.

(f) Any employee exercising such right shall carefully put away all tools, materials, equipment, or any other property of the Employer in a safe manner. Each Employee will be responsible for any loss to the Employer for neglect in carrying out this provision, but only when a safe place is provided for by the Employer.

(g) The Local Union is a part of the International Brotherhood of Electrical Workers, and any violation or annulment by an individual Employer of the approved Agreement of this or any other Local Union of the IBEW, other than violations of paragraph 2 of this Section, will be sufficient cause for the cancellation of this Agreement by the Local Union after a finding has been made by the International President of the Union that such a violation or annulment has occurred.

The subletting, assigning or transfer by an individual Employer of any work in connection with electrical work to any person, firm or corporation not recognizing the IBEW or one of its local unions as the collective bargaining representative of his Employees on any electrical work in the jurisdiction of this or any other local union to be performed at the site of the construction, alteration, painting, or repair of a building, structure or other work, will be deemed a material breach of this Agreement.

All charges of violations of paragraph 2 of this Section shall be considered as dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

(h) In order to protect and preserve, for the Employees covered by this Agreement, all work heretofore performed by them, and in order to prevent any devise or subterfuge to avoid the protection and preservation of such work, it is hereby agreed as follows: If and when the Employer shall perform any on-site construction work of the type covered by this Agreement, under its own name or under the name of another as a corporation, company, partnership, or any other business entity, wherein the Employer, through its officers, directors, partners or stock holders, exercise either directly or indirectly, management, control or majority ownership, the terms and conditions of this Agreement shall be applicable to all such work. All charges or violations of this Section shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

(1) As a remedy for violations of this Section, the Labor Management Committee, the Council on Industrial Relations for the Electrical Contracting Industry, and/or an independent arbitrator, as the case may be, are empowered, in their discretion and at the request of the Union, to require an Employer to (1) pay to affected employees covered by this Agreement, including registered applicants for employment, the equivalent of wages lost by such employees as a result of the violations; and (2) pay into the affected joint trust funds established under this Agreement any delinquent contributions to such funds which have resulted from the violations. Provision for this remedy herein does not make such remedy the exclusive remedy available to the Union for violations of this Section nor does it make the same or other remedies unavailable to the Union for violations of other Sections or other Articles of this Agreement.

(2) If as a result of violations of this Section, it is necessary for the Union and/or the Trustees of the joint trust funds to institute court action to enforce an award rendered in accordance with subsection (1) above, or to defend an action which seeks to vacate such award, the Employer shall pay any

5

accountants' and attorneys' fees incurred by the Union and/or Fund Trustees, plus cost of the litigation, which have resulted from the bringing of such court action.

(i) The Employer agrees to furnish all equipment necessary to safely perform work within the jurisdiction of the electrical workers.

**SECTION 2.04** (a) There shall be a Safety Committee of three (3) representing the Union and three (3) representing the Employer. It shall meet regularly at such stated times as it may decide, or within forty-eight (48) hours when notice is given by either party. It shall select its own Chairman and Secretary.

(b) All disagreements, or claims of violation of the Safety Rules which cannot be adjusted between the duly authorized representatives of the Union and Employer, shall be referred to this Committee for decision by majority vote.

(c) In the event the Committee is unable to render a decision by majority vote, or for any reason adjust the matter in dispute, it shall be referred to the Labor-Management Committee.

(d) The Employer agrees to and shall comply with all applicable provisions of the Safety Rules as submitted by the Safety Committee, and agreed to by the parties of this Agreement. Said Safety Rules set forth in a separate document or documents are hereby incorporated as part of this Agreement as if they were herein set forth at length.

(e) It is the Employer's exclusive responsibility to insure the safety of its Employees and their compliance with these Safety Rules and Standards.

(f) A joint committee will be established by the parties to implement a mutually acceptable OSHA training program.

**SECTION 2.05** (a) The Employer shall provide a separate suitable place on all jobs for keeping or storing of Employees' clothing, and shall be held responsible for the loss of these by fire.

(b) The Employer shall provide a separate suitable place on all jobs for keeping or storing of Employees' tools, and shall be held responsible for the loss of these by fire or theft up to a maximum of $400.00.

**SECTION 2.06** The Union agrees that if, during the life of this Agreement, it grants to any other Employer in the Electrical Contracting Industry on work covered by this Agreement, any better terms or conditions than those set forth in this Agreement, such better terms or conditions shall be made available to the Employer under this Agreement and the Union shall immediately notify the Employer of any such concessions.

**SECTION 2.07** The Union understands the Employer is responsible to perform the work required by the owner. The Employer shall, therefore, have no restrictions except those specifically provided for in the Collective Bargaining Agreement in planning, directing and controlling the operation of all his work, in deciding the number and kind of Employees to properly perform the work, in hiring and laying off Employees, in transferring Employees from job to job within the Local Union's geographical jurisdiction, in determining the need and number as well as the person who will act as Foreman, in requiring all Employees to observe the Employer's and/or owner's rules and regulations not inconsistent with this Agreement, in requiring all Employees to observe all safety regulations, and in discharging Employees for proper cause.

(a) "The Employer may incorporate the NECA model pre-hire program package".

**SECTION 2.08** The Employer agrees that, if it has not previously done so, it will recognize the Union as the exclusive collective bargaining agent for all employees performing electrical work within the jurisdiction of the

6

Union on all present and future job sites, if and when a majority of the Employer's employees authorize the Union to represent them in collective bargaining.

SECTION 2.09  An Employer signatory to a collective bargaining agreement or to a letter of assent to an agreement with another IBEW Local Union, who signs an assent to this Agreement, may bring up to four bargaining unit employees employed in that Local Union's jurisdiction into this Local's jurisdiction and up to two bargaining unit employees per job from that Local's jurisdiction to this Local's jurisdiction for specialty or service and maintenance work. All charges of violations of this section shall be considered as a dispute and shall be processed in accordance with the provisions of this agreement for the handling of grievances with the exception that any decision of a local labor-management committee that may be contrary to the intent of the parties to the National Agreement on Employee Portability, upon recommendation of either or both the appropriate IBEW International Vice President or NECA Regional Executive Director, is subject to review, modification, or recision by the Council on Industrial Relations.

SECTION 2.10  The Employer agrees to participate in Prevailing Wage Surveys

## ARTICLE III

## CONTRIBUTIONS & PAYROLL DEDUCTIONS

### N.E.B.F. - NATIONAL ELECTRICAL BENEFIT FUND (CONTRIBUTION)

SECTION 3.01  It is agreed that in accord with the Employees Benefit Agreement of the National Electrical Benefit Fund (NEBF), as entered into between the National Electrical Contractors Association and International Brotherhood of Electrical Workers on September 3, 1946, as amended, and now delineated as the Restated Employees Benefit Agreement and Trust, that unless authorized otherwise by the NEBF, the individual Employer will forward monthly to the NEBF's designated local collection agent an amount equal to three percent (3%) of the gross monthly labor payroll paid to, or accrued by, the Employees in this bargaining unit, and a completed payroll report prescribed by the NEBF. The payment shall be made by check or draft and shall constitute a debt due and owing to the NEBF on the last day of each calendar month, which may be recovered by suit initiated by the NEBF or its assignee. The payment and the payroll report shall be mailed to reach the office of the appropriate local collection agent not later than fifteen (15) calendar days following the end of each calendar month.

The individual Employer hereby accepts and agrees to be bound by, the Restated Employees Benefit Agreement and Trust.

An individual Employer who fails to remit as provided above shall be additionally subject to having his Agreement terminated upon seventy-two (72) hours notice, in writing, being served by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been paid to the appropriate local collection agent.

The failure of an individual Employer to comply with the applicable provisions of the Restated Employees Benefit Agreement and Trust shall also constitute a breach of this Agreement.

### N.E.I.F. - NATIONAL ELECTRICAL INDUSTRY FUND (CONTRIBUTION)

SECTION 3.02  Each individual Employer shall contribute an amount not to exceed one percent (1%), nor less than .2 of 1% of the productive electrical payroll as determined by each Local Chapter and approved by the Trustees, with the following exclusions:

 1.  Twenty-five percent (25%) of all productive electrical payroll in excess of 75,000 man-hours paid for electrical work in any one Chapter area during any one calendar year, but not exceeding 150,000 man-hours.

2.  One hundred percent (100%) of all productive electrical payroll in excess of 150,000 man-hours paid for electrical work in any one Chapter area during any one calendar year.

(Productive electrical payroll is defined as the total wages (including overtime) paid with respect to all hours worked by all classes of electrical labor for which a rate is established in the prevailing labor area where the business is transacted.)

Payment shall be forwarded monthly to the National Electrical Industry Fund in a form and manner prescribed by the Trustees no later than fifteen (15) calendar days following the last day of the month in which the labor was performed. Failure to do so will be considered a breach of this Agreement on the part of an individual Employer.

## LOCAL LABOR MANAGEMENT COOPERATION COMMITTEE (LMCC)

SECTION 3.02  (a)  The parties agree to participate in a Labor-Management Cooperation Fund, under authority of Section 6(b) of the Labor Management Cooperation Act of 1978, 29 U.S.C. 175(a) and Section 302(c)(9) of the Labor Management Relations Act, 29 U.S.C. 186(c)(9).  The purposes of this Fund include the following:

1.  to improve communications between representatives of Labor and Management;

2.  to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness;

3.  to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

4.  to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;

5.  to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and industry;

6.  to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations, and new methods of improved production;

7.  to engage in public education and other programs to expand the economic development of the electrical construction industry;

8.  to enhance the involvement of workers in making decisions that affect their working lives; and,

9.  to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

SECTION 3.02  (b)  The fund shall function in accordance with, and as provided in, its Agreement and Declaration of Trust and any amendments thereto and any other of its governing documents.  Each Employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the LMCC, as provided in said Agreement and Declaration of Trust

SECTION 3.02  (c)  Each employer shall contribute one and one quarter percent (1.25%) per hour worked. Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which the labor was performed.  The _____ Chapter, NECA, or its designee, shall be the collection agent for this Fund.

**SECTION 3.02**  (D)  If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance.  In the event the Employer is in default, the Employer shall be liable for a sum equal to 15% of the delinquent payment, but not less than the sum of twenty dollars ($20), for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reflecting the reasonable damages incurred by the Fund due to the delinquency of the payments.  Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid.  The Employer shall also be liable for all costs of collecting the payment together with attorneys' fees.

## LOCAL UNION 98 HEALTH & WELFARE PLAN (CONTRIBUTION)

**SECTION 3.03**  Effective 12:01 A.M. May 1, 1992, the Employer agrees to and shall comply with all applicable provisions of the Trust Agreement, establishing the International Brotherhood of Electrical Workers, Local Union 98 Health and Welfare Fund, entered into December 15, 1953, as amended.  The Trust Agreement provides for the payment of contributions monthly into the Trust Fund, which shall be known as the International Brotherhood of Electrical Workers, Local Union 98 Health and Welfare Fund, an amount equal to the amount specified in Appendix "A" (wage sheet).

## LOCAL UNION 98 PENSION PLAN (CONTRIBUTION)

**SECTION 3.04**  (a)  The Employer agrees to and shall comply with all applicable provisions of the Trust Agreement, establishing the Local Union 98, IBEW Pension Fund entered into September 1, 1961, as amended.

(b)  The Local Union 98 Pension Plan shall be jointly administered by an equal number of individual Trustees appointed by the Employer and an equal number of individual Trustees appointed by the Union.

(c)  Effective 12:01 A.M. Nov. 1, 1994, the Employer agrees to contribute for all Employees covered under the terms of this Agreement, an amount equal to 9.12% of his gross labor payroll paid to Employees in the bargaining unit represented by the Union under this Agreement.

## LOCAL UNION 98 DEFERRED INCOME PLAN (CONTRIBUTION)

**SECTION 3.05**  (a)  The Employer agrees to and shall comply with all applicable provision of the Trust Agreement, establishing the Local Union 98, IBEW Deferred Income Plan entered into July 4, 1983.

(b)  The Local Union 98 Deferred Income Plan shall be jointly administered by an equal number of individual Trustees appointed by the Employer and an equal number of individual Trustees appointed by the Union.

(c)  Effective 12:01 A.M. May 1, 2000, the Employer agrees to contribute for all Employees covered under the terms of this Agreement, an amount equal to twelve percent (12%) of his gross labor payroll paid to Employees in the bargaining unit represented by the Union under this Agreement.

## APPRENTICE TRAINING FUND (CONTRIBUTION)

**SECTION 3.06**  (a) Effective 12:01 A.M. September 6, 1993, all Employers subject to the terms of this Agreement shall contribute two-percent (2%) of their gross monthly labor payroll for the purpose of maintaining the Apprenticeship and Training Program.

## WORKING DUES (PAYROLL DEDUCTION)

SECTION 3.07  The Employer agrees to deduct and forward to the Financial Secretary of the Local Union upon receipt of a voluntary written authorization - the additional working dues from the pay of each IBEW member. The amount to be deducted shall be the amount specified in the approved Local Union By-Laws. Such amount shall be certified to the Employer by the Local Union upon request by the Employer.

The Union agrees to save the Employer harmless from any action growing out of these deductions, commenced by any Employee, and assumes full responsibility for the disposition of the funds deducted once they have been received by the Union.

## LOCAL UNION 98 VACATION PLAN (PAYROLL DEDUCTION)

SECTION 3.08  (a)  Each Employer shall withhold from the net wages due each of its employees covered by the Collective Bargaining Agreement a sum equal to 5.41% of said employees gross wages.  Such deduction shall be contributed by the Employer as set forth below.

(b)  The wage deductions shall be forwarded to a bank or other financial institution designated by mutual agreement of Local Union 98 and NECA, for deposit in Vacation Fund accounts, titled in the name of each employee. Local Union 98 shall be the Administrator of this Vacation Fund and, as such, shall have full power to contract with the selected bank or financial institution receiving the wage deductions, maintain records and take any and all appropriate action to enforce this agreement and protect the employee assets maintained in such accounts.  Local Union 98 shall not, however, have title to such funds or, other than the powers set forth above, maintain any discretionary control over the assets of the vacation fund accounts. Employers bound by this Agreement shall also be bound by any reasonable rules and regulations adopted by the Union concerning reporting, collection and delinquency procedures, including, but not limited to, a requirement that delinquent employers pay liquidated damage penalties, interest, audit fees (if required) and reasonable counsel fees and costs necessitated by collection proceedings.  The powers of administration and other duties and responsibilities set forth in this provision shall not, in any manner, be construed as allowing Local Union 98 to exercise any right, title or interest in or to any of the Vacation Fund accounts which shall, at all times, be titled and maintained in the name of each individual member for whom a contribution has been submitted by the Employer.

(c)  Each Employer shall, simultaneously with the transmittal of its contributions, transmit to the bank a report form setting forth, *inter alia*, each employee's Social Security number, name, the individual employee's gross the total of all employees' gross earnings, in addition to any other information that may, by rule, regulation or request, be required by the bank or by the Local Union.

SECTION 3.09  (a)  It is agreed that failure to pay wages, and/or other fringe benefits, without exception, as provided for in this Agreement by an individual Employer will be sufficient cause to having the temporary removal of electricians from such individual Employer, after being served seventy-two (72) hours notice, in writing, by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been paid to the Local Employees' Benefit Board and the Local Union Benefit Funds.

(b)  Contributions to the Local Union 98 Deferred Income Plan, Local Union 98 Health & Welfare Plan, Local Union 98 Pension Fund, Apprentice Training Fund, and deduction for the Local Union 98 Vacation Plan, shall be made in accordance with the applicable Trust document.  All such contributions, as well as the working dues deduction, shall be sent to the designated depository.  These payments must be received by or bear a U.S. Postal Service postmark on or before the 15th day of the month following the month in which the labor giving rise to the required payment was performed.  All contributions or payments not received as stated herein shall be deemed delinquent and this delinquency shall result in the imposition of a ten percent (10%) penalty of the total contribution as well as interest at the rate of two percent (2%) per month, or portion thereof, of the total contribution until payment has been received.

10

(c)  Employers participating in the Automated Funds Collection Procedure prescribed by the Joint Funds Trustees are required to submit all necessary data in the prescribed manner no later than the eight (8th) day of the month following the month in which the work was performed.  Payment must be made in the prescribed manner no later than the twentieth (20th) day of the month following the month in which the work was performed.

SECTION 3.10   The following procedures will apply in the event of a delinquency:

1. Contributions and deductions must be paid or post-marked by the U.S. Postal Service by the 15th of the month following the month in which there was covered employment.  Reports must be completed and returned each month regardless of whether there were covered hours of employment.

2. Any contributions and deductions not paid or post-marked after the 15th of the month are delinquent and shall be subject to the interest and damages provisions of 3.09 of the NECA Agreement.  In addition:

(a)  Any shortages on a report, plus interest and liquidated damages owed, must be paid by or postmarked by the U.S. Postal Service by the 15th of the month immediately following the receipt of the shortage notification or they shall be deemed delinquent and subject to the provisions below.

(b)  Interest and liquidated damages assessments must be paid or postmarked by the U.S. Postal Service by the 15th of the month immediately following the receipt of the assessment or they shall be deemed delinquent and subject to the provisions below.

3. Any employer who has not paid any delinquent contributions or deductions by the first of the month following the month in which they were due shall be subject to any or all of the following actions:

(a)  A lawsuit shall be immediately instituted in federal court or other appropriate forum.  The Funds shall be entitled to recover the contributions and deductions, interest, liquidated damages and attorneys' fees and costs.

(b)  Written notice pursuant to 3.09(a) of the NECA Agreement shall be sent to the delinquent employer that the employees shall be subject to removal after seventy-two hours unless the delinquent contributions and deductions are paid or a settlement agreeable to the Committee has been reached.

(c)  Once the employer is deemed delinquent under these procedures, it shall pay contributions and deductions on a weekly basis, and shall continue until such time as the Committee determines that weekly payments are no longer necessary.

SECTION 3.11   With employee authorization, the Employer may voluntarily make a payroll deduction to be paid to the Local Union 98, IBEW Credit Union.

## ARTICLE IV

## WAGES AND HOURS

SECTION 4.01   (a) Eight hours shall be the daily working period, starting between the hours of 7:00 A.M. and 8:00 A.M., with a thirty minute lunch period.

(b)  Five days shall be the regular work week, Mondays to Fridays, inclusive.  The work week starts between the hours of 7:00 A.M. and 8:00 A.M. Monday.

11

## OVERTIME, HOLIDAYS

**SECTION 4.02** (a)  Work performed on New Year's, Memorial, Independence, Labor, Thanksgiving, and Christmas Day shall be paid for at rates double those stated in Section 4.04(a). Holidays falling on a Sunday will be celebrated on Monday.

(b)  Election Day shall be included and subject to the terms of Section 4.02(a) when notification has been given by either party to the Labor Management Committee. The Labor Management Committee will notify the employers and members of the Union in a timely manner and in any case, no less than one week in advance.  Four - 10 hour days may be worked in exchange for Election Day.

(c)  Hours worked, either prior to, or after the daily working period, Monday through Friday shall be paid at one and one-half (1-1/2) times the hourly rate*. All hours worked on Saturdays shall be paid at one and one-half (1-1/2) times the hourly rate*.  All hours worked on Sundays and holidays shall be paid at two (2) times the hourly rate*, until 7:00 AM on Monday Morning.

* As stated in Section 4.04(a).

(d)  Unless a continuous eight hour rest period is provided after overtime stops, overtime rates shall apply to all time worked after overtime starts, except as provided for in paragraph (e) of this Section.

(e)  If a man works past midnight, the eight (8) hour rest period shall not be required on a one (1)-time basis for the duration of the job.

(f)  Overtime will be allowed to be worked for tie-ins, cut-overs, emergency shutdowns, and repairs when specifically called for by project documents.  All other overtime must be cleared by, the Business Manager.

## SHIFTS

**SECTION 4.03** (a)  When so elected by the contractor, multiple shifts of at least five (5) days duration may be worked.

(b)  When two (2) or three (3) shifts are worked: The first shift (day shift) shall be worked between the hours of 8:00 A.M. and 4:30 P.M. Workmen on the day shift shall receive eight (8) hours pay at the regular hourly rate for eight (8) hours work.

(c)  The second shift (swing shift) shall be worked between the hours of 4:30 P.M. and 12:30 A.M. Workmen on the "swing shift" shall receive eight (8) hours pay at the regular hourly rate plus ten percent (10%) for seven and one-half (7-1/2) hours work.

(d)  The third shift (graveyard shift) shall be worked between the hours of 12:30 A.M. and 8:00 A.M. Workmen on the "graveyard shift" shall receive eight (8) hours pay at the regular hourly rate plus fifteen percent (15%) for seven (7) hours work.

(e)  A lunch period of thirty (30) minutes shall be allowed on each shift.  All overtime work required after the completion of a regular shift shall be paid at one and one-half times the "shift" hourly rate.

(f)  There shall be no pyramiding of overtime rates and double the straight-time rate shall be the maximum compensation for an hour worked.  There shall be no requirement for a day shift when either the second or third shift is worked.

**SECTION 4.04** (a)  The rates of wages for the hours and days stated in Section 4.01 (a) and (b) during the effective period of this Agreement shall be as hereinafter stated:  (See Appendix "A")

(b) The Foreman's wage rates shall be as follows:

### 1. Foreman

On each job where two (2) to nine (9) men are employed for four (4) consecutive days, one of them shall be designated by the Employer as FOREMAN, and shall receive a minimum of $2.00 more than the journeyman's rate.

### 2. General Foreman

On each job where ten (10) to twenty-two (22) men are employed for four (4) consecutive days, one of them shall be designated by the Employer as GENERAL FOREMAN, and shall receive a minimum of $3.50 more than the journeyman's rate.

### 3. Project Foreman

On each job where twenty-three (23) or more men are employed for four (4) consecutive days, one of them shall be designated by the Employer as PROJECT FOREMAN, and shall receive a minimum of $5.00 more than the journeyman's rate.

After the rate is established for the job, it shall remain until the number of men triggering that rate decreases and remains below a classification for a period of four (4) consecutive days. The rate of that classification shall then apply.

### 4. Sub-Foreman

Where twelve (12) men are employed on a job for four (4) consecutive days, one of them shall be designated by the Employer as SUB-FOREMAN and shall receive a minimum of $1.75 more than the journeyman's rate. For each eleven (11) men above twelve (12) employed on a job for four (4) consecutive days, an additional SUB-FOREMAN shall be designated by the Employer, and shall receive a minimum of $1.75 more than the journeyman's rate. The Sub-Foreman rate shall expire for a journeyman when the number of men triggering this classification is reduced by six (6) or more men.

(c) No journeyman shall be appointed as a sub-foreman, foreman, general foreman or project foreman unless he has successfully completed a foreman training course approved by the NJATC and administered jointly by Local Union 98 and the JATC. 98 Journeyman electricians who have been employed as foremen for a period of six months for an Employer performing work in the jurisdiction of Local Union 98 prior to May 1, 1997; will not be required to complete a foreman training course all others must complete a foreman-training course.

**SECTION 4.05** (a) Each weekly payroll period shall terminate at 12 midnight Sunday, and wages shall be paid in U.S. Currency or by check drawn on a local bank with Employer identification on check stubs, however, not more than three (3) regular work days wages may be withheld at any time.

(b) In the event that any Employer issues an uncollectible check, no further work shall be performed by members of the Union, until the sum involved has been made good, together with all added costs. Said Employer may be required to pay all wages due Employees in cash, cashier's check or certified check.

**SECTION 4.06** (a) At least thirty (30) minutes notice shall be given of discharge or layoff and all wages due shall be paid in full at that time. Waiting time for wages, either on regular pay day, or upon discharge or layoff, shall be paid for at rates double those stated in Section 4.04(a).

(b) In the event of a firing, the Employer may mail the payoff check to the union hall, no later than the end of the next business day.

SECTION 4.07   Initial period of employment shall consist of not less than four (4) consecutive hours.

SECTION 4.08   Unless Employees are instructed not to report for work at least two (2) hours prior to their regular designated starting time, and they so report, (except in cases where men report, when it should be obvious, by the exercise of reasonable judgment, that no work could be performed because of weather conditions) they shall be paid not less than two (2) hours straight time wages, regardless of whether or not any work has been performed.  They shall remain for the two (2) hours unless excused by a proper representative of the Employer.

SECTION 4.09   Work performed in the jurisdiction of another Local Union having higher wage rates shall be paid for at the higher rate.

SECTION 4.10   (a) No traveling time shall be paid for traveling, either before or after working hours, to or from any job within the jurisdiction of the Union.

(b)  When the Employee is required to travel from one job to another within the jurisdiction of the Union during working hours, the Employer shall pay full traveling time and all traveling expenses.

(c)  When an Employee is employed outside the jurisdiction of the Union, at the request of the Employer, the Employer shall furnish or pay for all transportation and living expenses.

(d)  When an Employee is employed outside the jurisdiction of the Union, at the request of the Employer, the Employer shall make all negotiated fringe benefits and deductions in accordance with the terms of the Agreement, the same as if the Employee is employed within the jurisdiction of the Union, except where Reciprocal Agreements exist.

## ARTICLE V

### GENERAL

SECTION 5.01   No Employee shall use any automobile, motorcycle, or other vehicle in a manner considered to be unfair to other Employees or against the interests of the Union.

SECTION 5.02   Journeymen and apprentices shall, at all times, have a sufficient number of tools to properly perform any work on which they are employed.

SECTION 5.03   Employees shall be held responsible for the Employer's tools and equipment, providing the Employer furnishes a tool box with proper lock or other safe place for the storing of such tools or equipment, and allows a reasonable time for such care.

SECTION 5.04   Employees shall install all electrical work in accordance with Municipal rules and code requirements, also the contract specifications, and in a safe and workmanlike manner.

SECTION 5.05   All pulling of wire or cable shall be done by hand, by manually operated winch or by such power drive as is within the jurisdictional rights of the I.B.E.W.

SECTION 5.06   On all jobs requiring five (5) or more journeymen, at least every fifth journeyman, if available, shall be fifty (50) years of age or older.

SECTION 5.07   The inability of an Employee to safely perform his/her work functions due to the influence of drugs or alcohol shall be grounds for immediate dismissal from the shop and/or job site; and the Steward or

14

Union shall be notified when such action is taken.

SECTION 5.08  With fifteen percent (15%) or greater unemployment for seventy-five calendar days the Labor-Management Committee will institute a Mandatory Vacation Program which will exclude supervision.

SECTION 5.09  Job Stewards shall be appointed by the Business Manager of the Union from among the Employees on the job or in the shop and must be a Local Union 98 Journeyman.  When a steward has been appointed to a job he shall remain on such job until the next to the last journeyman.  Any reduction in force, which includes the Steward shall be cleared with the Business Manager.  The decision of the Business Manager may be appealed to the Labor-Management Committee.

SECTION 5.10  There shall be no restrictions on the use of catalog items.  This does not preclude the performance of electrical work by bargaining unit persons in an Employer's shop facility under the terms of this Agreement.

## TEMPORARY WIRING

SECTION 5.11  (a) Temporary wiring shall be defined to include the installation and maintenance of all electrical work required or found necessary to be performed on any type of job under the scope jurisdiction of this Agreement and/or prevailing industry practices wherein electricity is being used for productive construction purposes, excluding cord and plug connected equipment and self contained powered lighting.

(b)  Electrical workers employed under the terms of this Agreement and employed by an electrical contractor, who is signatory to this Agreement, shall install and maintain all temporary wiring.

(c)  The installation and maintenance of temporary wiring shall, during all working hours, be the complete responsibility of the electrical workers employed under the terms of this Agreement.

(d)  Effective on all projects begun on or after April 28, 2003, where electric lighting, power and/or equipment is required for productive construction installation outside of normal working hours by workmen other than electricians, one (1) journeyman electrician shall be employed on the site to maintain that temporary.  If the contractor hired to maintain that temporary wiring determines that the maintenance of the temporary does not require the full time attention of the journeyman, then the contractor may elect to assign that journeyman to perform productive work if available.  If it is determined that no electrical contractor signatory to this Agreement has been hired or contracted with to maintain that temporary electrical after normal working hours, then for the purpose of life safety that temporary wiring shall be de-energized with the exception of temporary wiring for heating/air conditioning, job trailers, shanties, receptacles used for equipment charging, ingress/egress and security.

(e)  Under all project circumstances, temporary electric shall be left energized and in working condition past normal working hours for lighting, heating/air conditioning, job trailers and shanties, receptacles used for equipment charging, ingress/egress and security without the requirement for a journeyman electrician to be employed past normal working hours.

## ARTICLE VI

## STANDARD INSIDE APPRENTICESHIP LANGUAGE

SECTION 6.01  There shall be a Joint Apprenticeship and Training Committee (JATC) consisting of a total of 6 members who shall also serve as trustees to the local apprenticeship and training trust.  An equal number of members three (3) shall be appointed, in writing, by the local chapter of the National Electrical Contractors Association (NECA) and the local union of the International Brotherhood of Electrical Workers (IBEW).

The local apprenticeship standards shall be in conformance with national guideline standards and policies. All apprenticeship standards shall be registered with the NJATC and thereafter submitted to the appropriate registration agency.

The JATC shall be responsible for the training of apprentices, journeymen, installers, technicians, and all other (unindentured, intermediate journeymen, etc.)

**SECTION 6.02** All JATC members appointments, reappointment and acceptance of appointments shall be in writing. Each member shall be appointed for a 3 year term, unless being appointed for a lesser period of time to complete an unexpired term. The terms shall be staggered, with one (1) term from each side expiring each year. JATC members shall complete their appointed term unless removed for cause by the party they represent or they voluntarily resign. All vacancies shall be filled immediately.

The JATC shall select from its membership, but not both from the same party, a Chairman and a Secretary who shall retain voting privileges. The JATC will maintain one (1) set of minutes for JATC Committee meetings and a separate set of minutes for trust meetings.

The JATC should meet on a monthly basis, and also upon the call of the Chairman.

**SECTION 6.03** Any issue concerning an apprentice or an apprenticeship matter shall be referred to the JATC for its review, evaluation and resolve; as per standards and policies. If the JATC deadlocks on any issue, the matter shall be referred to the Labor-Management Committee for resolution as outlined in Article I, of this agreement; except for trust fund matters, which shall be resolved as stipulated in the local trust instrument.

**SECTION 6.04** There shall be only one (1) JATC and one (1) local apprenticeship and training trust. The JATC may, however, establish joint subcommittees to meet specific needs such as residential or telecommunications apprenticeship. The JATC may also establish a subcommittee to oversee an apprenticeship program within a specified area of the jurisdiction covered by this agreement.

All subcommittee members shall be appointed, in writing, by the party they represent. A committee member may or may not be a member of the JATC.

**SECTION 6.05** The JATC may select and employ a part-time or a full-time Training Director and other support staff, as it deems necessary. In considering the qualifications, duties and responsibilities of the Training Director, the JATC should review the Training Director's Job Description provided by the NJATC. All Employees of the JATC shall serve at the pleasure and discretion of the JATC.

**SECTION 6.06** To help ensure diversity of training, provide reasonable continuous employment opportunities and comply with apprenticeship rules and regulations, the JATC, as the program sponsor, shall have full authority for issuing all job training assignments and for transferring apprentices from one employer to another. The employer shall cooperate in providing apprentices with needed work experiences. The local union referral office shall be notified, in writing of all job-training assignments. If the employer is unable to provide reasonable continuous employment for apprentices, the JATC is to be notified.

**SECTION 6.07** All apprentices shall enter the program through the JATC as provided for in the registered apprenticeship standards and selection procedures.

An apprentice may have their indenture canceled by the JATC at any time prior to completion as stipulated in the registered standards. Time worked and accumulated in apprenticeship shall not be considered for local union referral purposes until the apprentice has satisfied all conditions of apprenticeship. Individuals terminated from apprenticeship shall not be assigned to any job in any classification, or participate in any related training unless they are reinstated in apprenticeship as per the standards, or they qualify through means other than apprenticeship, at sometime in the future, but no sooner than two years after their class has completed apprenticeship, and they have gained related knowledge and job skills to warrant such classification.

16

**SECTION 6.08**  The JATC shall select and indenture a sufficient number of apprentices to meet local manpower needs. The JATC is authorized to indenture a total number of apprentices not to exceed a ration of one (1) apprentice to three (3) Journeyman/Wiremen normally employed in the jurisdiction, unless they are authorized and instructed to increase the number by the parties to the local IBEW/NECA collective bargaining agreement. The JATC shall indenture a larger number of apprentices provided the individuals are entering the program as the result of direct entry through organizing; as provided for in the registered apprenticeship standards.

**SECTION 6.09**  Though the JATC cannot guarantee any number of apprentices; if a qualified employer requests an apprentice, the JATC shall make reasonable efforts to honor the request. If the JATC is unable to fill the request within ten (10) working days, and the JATC has less than a one (1) to three (3) ratio indentured; they shall select and indenture the next available person maintained by the JATC as per the selection procedures.

**SECTION 6.10**  To accommodate short term needs when apprentices are unavailable, the JATC shall assign unindentured workers who meet the basic qualifications for apprenticeship. Unindentured workers shall not remain employed if apprentices become available for OJT assignment. Unindentured workers shall be used to meet job site ratios except on wage and hour (prevailing wage) job sites.

Before being employed, the unindentured person must sign a letter of understanding with the JATC and the employer, agreeing that they are not to accumulate more than two thousand (2000) hours as an unindentured, that they are subject to replacement by indentured apprentices and that they are not to work on wage and hour (prevailing wage) job sites.

Should an unindentured worker be selected for apprenticeship, the JATC will determine, as provided for in the apprenticeship standards, if some credit for hours worked, as an unindentured will be applied toward the minimum OJT hours of apprenticeship.

The JATC may elect to offer voluntary related training to unindentured; such as Math Review, English, Safety, Orientation/Awareness, Introduction to OSHA, First-Aid and CPR. Participation shall be voluntary.

**SECTION 6.11**  The Employer shall contribute to the local health and welfare plans and to the National Electrical Benefit Fund (NEBF) on behalf of all apprentices and unindentured. Contributions to other benefit plans may be addressed in other sections of this agreement.

**SECTION 6.12**  Each job site shall be allowed a ratio of two (2) apprentices for every three (3) Journeyman Wiremen or fraction thereof as illustrated below.

| Number of Journeyman | Maximum Number of Apprentices/Unindentured |
|---|---|
| 1 to 3 | 2 |
| 4 to 6 | 4 |
| 7 to 9 | 6 |




| 97 to 99 | 66 |
|---|---|
| etc. | etc. |

The first person assigned to any job site shall be a Journeyman/Wireman.

A job site is considered to be the physical location where employees report for their work assignments. The employer's shop (service center) is considered to be a separate, single job site.

All physical locations where workers report for work are each considered to be a single separate job site.

**SECTION 6.13**  An apprentice is to be under the supervision of a Journeyman/Wireman at all times. This does not imply that the apprentice must always be in-sight-of a Journeyman/Wireman. Journeymen are not required to constantly watch the apprentice. Supervision will not be of a nature that prevents the development of responsibility and initiative. Work may be laid out by the Employers designated supervisor or journeyman based on their evaluation of the apprentice's skills and ability to perform the job tasks. Apprentices shall be permitted to perform job tasks in order to develop job skills and trade competencies. Journeymen are permitted to leave the immediate work area without being accompanied by the apprentice.

Apprentices who have satisfactorily completed the first four years of related classroom training using the NJATC curriculum and accumulated a minimum of 6,500 hours of OJT with satisfactory performance, shall be permitted to work alone on any job site and receive work assignments in the same manner as a Journeyman Wireman.

An apprentice shall not be the first person assigned to a job site and apprentices shall not supervise the work of others.

**SECTION 6.14**  Upon satisfactory completion of apprenticeship, the JATC shall issue all graduating apprentices an appropriate diploma from the NJATC. The JATC may also require each apprentice to acquire any electric license required for journeymen to work in the jurisdiction covered by this agreement.

**SECTION 6.15**  The parties to this Agreement shall be bound by the Local Joint Apprenticeship and Training Trust Fund Agreement which shall conform to Section 302 of the Labor-Management Relations Act 1947 as amended, ERISA and other applicable regulations.

The trustees authorized under this Trust Agreement are hereby empowered to determine the reasonable value of any facilities, materials or services furnished by either party. All funds shall be handled and disbursed in accordance with the Trust Agreement.

**SECTION 6.16**  All Employers subject to the terms of this Agreement shall contribute the amount of funds specified by the parties' signatory to the Local Apprenticeship and Training Trust Agreement. The current rate contribution is 2%. This sum shall be due the Trust Fund by the same date as is their payment to NEBF under the terms of the Restated Employees Benefit Agreement and Trust.

## ARTICLE VII

## NATIONAL LABOR MANAGEMENT COOPERATION COMMITTEE

**SECTION 7.01**  The parties agree to participate in the NECA-IBEW National Labor-Management Cooperation Fund, under authority of Section 6(b) of the Labor Management Cooperation Act of 1978, 29 U.S.C. 175(a) and Section 302(c)(9) of the Labor Management Relations Act, 29 U.S.C. 186(c)(9). The purpose of this Fund includes the following:

1. to improve communication between representatives of labor and management;

2. to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organization effectiveness;

3. to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

18

4.  to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;

5.  to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and the industry;

6.  to encourage and support the initiation and operation of similarly constituted local labor-management cooperation committees;

7.  to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations, and new methods of improved production;

8.  to engage in public education and other programs to expand the economic development of the electrical construction industry;

9.  to enhance the involvement of workers in making decisions that affect their working lives; and

10. to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

**SECTION 7.02**  The Fund shall function in accordance with, and as provided in, its Agreement and Declaration of Trust, and any amendments thereto and any other of its governing documents. Each Employer hereby accept, agrees to be bound by, and shall be entitled to participate in the NLMCC, as provided in said Agreement and Declaration of Trust.

**SECTION 7.03**  Each Employer shall contribute one cent (.01) per hour worked under this Agreement up to a maximum of 150,000 hours per year. Payments shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which the labor was performed. The Penn Del Jersey Chapter of NECA, or its designee, shall be the collection agent for this Fund.

**SECTION 7.04**  If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance. In the event the Employer is in default, the Employer shall be liable for a sum equal to 15% of the delinquent payment, but not less than the sum of twenty dollars ($20), for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reelecting the reasonable damages incurred by the Fund due to the delinquency of the payments. Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid. The Employer shall also be liable for all costs of collecting the payment together with attorneys' fees.

### ARTICLE VIII

### PRODUCTIVITY, JOB ASSIGNMENT AND SCOPE FOR IBEW LOCAL 98 COMMERCIAL AGREEMENT

**SECTION 8.01**  The Employers and the Union are totally committed to improving productivity in unionized construction. The parties understand that owners and construction managers take into account, in the selection of contractors, the contractors' reputation in the field for productivity. It is further understood that the key to success of unionized construction is labor productivity.

The parties agree that every effort shall be made by the parties to insure the highest level of productivity and the expeditious performance of work assignments with the pledge of eight hours work for eight hours pay. Employees shall be at their workstation at the designated starting time and will not leave until the designated lunch break and/or quitting time. There shall be no unauthorized breaks, loafing and tardiness and unexcused absenteeism will not be tolerated.

The Employer recognizes that certain work, as described below, has been historically and customarily performed by Inside Electrical Workers of IBEW Local 98 (the "Traditional Inside Electrical Work"). To the extent the Employer controls the assignments of Traditional Inside Electrical Work, it will perform the work with Inside Electrical Workers represented by Local 98 within its geographical jurisdiction. If the work is not part of the Employer's contract but is within the scope of Traditional Inside Work, it will be performed by Inside Wiremen of the IBEW working for other contractors who are also signatory to this labor agreement. For purposes of this section, Traditional Electrical Work includes:

1. Coring of holes for raceways for electrical power or control and sound and communication devices, equipment, or fixtures.

2. Installing conduits, power cables or direct burial power cable inside the property line as defined by the Tariff for the purpose of electrical and communications work.

3. Installing of fire alarm, life safety, dictaphone, nurses call systems, operation room lights, patient monitoring equipment, X-ray equipment, cat scan, MRI and all electrical scanning equipment.

4. Handling of or loading or unloading of all appliances or equipment that are "all electric" including refrigerators, freezers, electric range, electric ovens, microwaves, non-ducted range hoods, mixers, blenders, television, video cassette recorders, lamp fixtures, DVD players.

5. The installation of all conduits, setting of all lights, electric light poles, including anchor bolts, wiring of all fixtures, fixture heads relating to all lighting for runways, taxiways at airports, parking lots and all lighting inside property lines.

6. The cutting and mechanical assembly of all electrical raceways, brackets, hangers, racks and any and all types of support beyond the building structure to be used to support and/or hold any wire, conduit, tray or any other electrical raceway or device and or equipment.

7. The lifting, setting and placement of all switchgear and sound equipment, electrical panels, electrical cabinets, motor control centers, transformers, speakers and their supports.

8. The installation of brackets to support or feed any electrically powered appliance (that doesn't have a mechanical connection) such as television and microwaves, and excluding structural support items inside of walls/ceilings. Such appliances will be unloaded, stored and distributed by the IBEW.

9. Cutting of all existing ("existing" meaning installed at the project prior to the award of the Employer's contract) installed ceiling tile, sheetrock or other existing installed material for the installation of fixtures, appliances, electrical equipment, sound and communication equipment, projection equipment and projection screens of any type and including cutting floors.

10. The loading, unloading and handling of all computer equipment, wiring, conduit, and other raceways, connecting of computer power cables to branch circuit junction boxes and/or electrical panels, including the final placement of computers and all necessary connections for complete installation with the exception of the final placement of existing personal computer equipment by the owner's personnel.

11. All surface mounted plywood for backing for supports for all electrical powered and sound and communication equipment.

20

12. Offloading, handling and installation of electrical space and baseboard heaters and electrical controls and electrical components for HVAC systems.

13. The unloading and loading of any vehicle from which said games of chance, slot machines (manual or electrical) arrives or leaves said establishment.

14. The loading and unloading, uncrating or packaging, the movement and placement whether temporary or permanent, and all wiring and terminations, both electrical and data of any games of chance (e.g. slot machines, video poker machines, pinball, etc.) using electric or data transmissions will be done by IBEW Local Union 98.

The parties agree that the intent of these provisions is to state the scope of Traditional Inside Electrical Work presently being performed by the Inside Electrical Workers of IBEW Local 98; it is not an attempt to claim work that has not been historically and customarily performed by the inside Electrical Workers of IBEW Local 98.

21

### INDIVIDUAL LETTER OF ASSENT-A

In signing this letter of assent, the undersigned firm does hereby authorize the Philadelphia Division, Penn-Del-Jersey Chapter, N.E.C.A. as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent approved Inside Commercial labor agreement between the Philadelphia Division, Penn-Del-Jersey Chapter, N.E.C.A. and Local Union 98, I.B.E.W. In doing so, the undersigned firm agrees to comply with, and be bound by, all of the terms and conditions contained in said current and subsequent approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective on the _____ day of _____, 20__. It shall remain in effect until terminated by the undersigned Employer giving written notice to the Philadelphia Division, Penn-Del-Jersey Chapter, N.E.C.A. and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement.

The Employer agrees that if a majority of its Employees authorize the Local Union to represent them in collective bargaining, the Employer will recognize the Local Union as the NLRA Section 9 (a) collective bargaining agent for all employees performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites.

In accordance with Orders issued by the United States District Court for the District of Maryland on October 10, 1980, in Civil Action HM-77-1302, if the undersigned Employer is not a member of the National Electrical Contractors Association, this letter of assent shall not bind the parties to any provision in the above-mentioned agreement requiring payment into the National Electrical Industry Fund, unless the above Orders of Court shall be stayed, reversed on appeal, or otherwise nullified.

### SUBJECT TO THE APPROVAL OF THE INTERNATIONAL PRESIDENT - I.B.E.W.

Firm: _____

### SIGNED FOR THE EMPLOYER

By: _____

Title: _____

Date: _____

### SIGNED FOR LOCAL UNION 98, I.B.E.W.

By: _____

Title: _____

Date: _____

22

## SEPARABILITY CLAUSE

Should any provision of this Agreement be declared illegal by any court of competent jurisdiction, such provisions shall immediately become null and void, leaving the remainder of the Agreement in full force and effect and the parties shall, thereupon, seek to negotiate substitute provisions where are in conformity with the applicable laws.

## SIGNATURE PAGE

EFFECTIVE DATES:   April 21, 2003 UNTIL April 20,2006

Signed for:

Philadelphia Division of the
Penn-Del-Jersey Chapter,
N.E.C.A.

Jeffrey Scarpello
Robert Duff
Thomas Moore, Jr.
Ronald Zemnick

Signed for:

Local Union 98,
International Brotherhood of Electrical
Workers of Philadelphia, Pa

John J. Dougherty
Harry Foy
Edward J. Coppinger
John F. Dershimer, Jr.
Michael Hnatkowsky

# COMMERCIAL
## TYPE OF AGREEMENT

**DIVISION:** PHILADELPHIA

**BUSINESS MANAGER:** John J. Dougherty

**ANNIVERSARY DATE:** April 20, 2006

**LOCAL UNION:** #98

**TELEPHONE:** 215-563-5592

**FAX:**      215-561-2168

|  | 4/28/03 | NEW% | NEW EFFECTIVE DATES 5/2/2004 | 5/1/2005 |
|---|---|---|---|---|
| **JOURNEYMAN BASE RATE** | $ 36.38 | | $ 37.96 | $ 40.01 |

## CONTRACTOR CONTRIBUTIONS

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Health & Welfare | 16.00% | $ 5.83 | 16.00% | $ 6.08 | $ 6.40 |
| Pension | 9.12% | $ 3.31 | **10.50%** | $ 3.99 | $ 4.20 |
| Deferred Income | 12.00% | $ 4.36 | **12.5%** | $ 4.75 | $ 5.00 |
| N.E.B.F. (gross payroll) | 3% | $ 1.09 | 3% | $ 1.14 | $ 1.20 |
| Apprenticeship & Training | 2% | $ .72 | 2% | $ .75 | $ .80 |
| **Total Cost Per Hour** | | $ 51.69 | | $ 54.66 | $ 57.61 |
| | | | | | |
| LMCC/Administrative Fund | 1.25% | $ .46 | 1.25% | $ .47 | $ .51 |
| N.E.I.F. | .25% | $ .09 | .25% | $ .09 | $ .12 |
| **Total Cost Per Hour** | | | | | |
| **with LMCC /AF & NEIF** | | $ 52.24 | | $ 55.24 | $ 58.24 |

## SHOP & MAINTENANCE RATE AS PER AGREEMENT

| | |
|---|---|
| Foreman 2 - 9 Men | $ 2.00 + Journeyman's Base Rate |
| General Foreman 10 - 22 Men | $ 3.50 + Journeyman's Base Rate |
| Project Foreman 23 Men & Over | $ 5.00 + Journeyman's Base Rate |
| Sub-Foreman | $ 1.75 + Journeyman's Base Rate |

**NOTE: Rates now include all men on job

## APPRENTICE RATES

| First Period | 0 – 1000 Hours | $ 10.91 | 30% | $ 11.39 | $ 12.00 |
|---|---|---|---|---|---|
| Second Period | 1000 – 2000 Hours | $ 12.73 | 35% | $ 13.29 | $ 14.00 |
| Third Period | 2000 – 3500 Hours | $ 14.55 | 40% | $ 15.18 | $ 16.00 |
| Fourth Period | 3500 – 5000 Hours | $ 18.19 | 50% | $ 18.98 | $ 20.01 |
| Fifth Period | 5000 – 6500 Hours | $ 21.83 | 60% | $ 22.78 | $ 24.01 |
| Sixth Period | 6500 – 8000 Hours | $ 27.29 | 75% | $ 28.47 | $ 30.01 |

## ADDITIONAL INFORMATION

PLEASE NOTE:  First and second period apprentices will receive Health & Welfare Benefits and NEBF ONLY.
     Check with JATC, 215-567-6405, for all classifications.

CONTRIBUTIONS: to the LMCC/Administrative Fund/NEIF are due on all classifications including first and second year              apprentices.

## CHECK - OFFS

| Vacation – Deducted on all classifications | $ 1.97 | 5.41% | $ 2.05 | $ 2.16 |
|---|---|---|---|---|
| Working Dues – Deducted on all classifications | $ 1.27 | 3.50% | $ 1.33 | $ 1.40 |
| Working Dues – SUB – deducted on all classifications | $ 1.09 | 3.00% | $ 1.14 | $ 1.20 |
| Job Recovery – Deducted on Journeyman Only | $ .64 | 1.75% | $ .66 | $ .70 |
| **Total Check Offs** | $ 4.97 | | $ 5.19 | $ 5.47 |

REVISED 4/29/04

## GEOGRAPHICAL JURISDICTIONAL LINES OF LOCAL UNION 98, IBEW

**Bucks County:**  In the area between the following lines.

1. Starting at the Delaware River and following the west limits of the Borough of Bristol, along the continuation of U.S. Highway 13 and under the Pennsylvania Railroad bridge to Route 09113, north on 09113 to Route 152, north along Route 152 to Hulmeville Road, east on Hulmeville Road to Route 344, north on Route 344 to the junction of Spurs 281 and 252, continue north on Spur 252 to Route 09028, west on 09028 to Route 152, north on 152 to TR 532, north on TR 532 to TR 113, north on TR 113 to TR 232 at Anchor Inn, northeast on TR 232 and continue northeast along Route 659 to Route 09060, west on 09060 to Route 402, north on 402 to the Borough line at the southwest corner of the Borough of New Hope. The Borough of New Hope is excluded.

2. Starting at the Delaware River and proceeding southwest along the Plumstead-Solebury and the Plumstead-Buckingham Township lines to Route 09064, northwest 09064 to U.S. Highway 611, south on 611 to the Spur of Route 270, northwest along the Spur to Route 397, southwest on 397 to Route 350, southeast on 350 to Route 395, southwest on 395 to Route 09069, southeast on 09069 to Route 09041, southwest on 09041 to the Montgomery County line.

**Delaware County:**

That portion east of a line following State Highway 320 from Montgomery County to Marple, then along the Springfield Road to Saxer Avenue, along Saxer Avenue to Powell Road, along Powell Road to State Highway 420 and continuing in a straight line to the Delaware River.

**Montgomery County:**

That portion southeast of a line following Lower State Road from Bucks County southwest to the Bethlehem Pike (U.S. Highway 309), south on Bethlehem Pike to the Penllyn Pike, Southwest on the Penllyn and Blue Bell Pikes to the Wissahickon Creek, southeast on the Wissahickon Creek to Butler Pike to North Lane near Conshohocken Borough, southeast on North Lane near to the Schuylkill River and continuing southeast in a line to Spring Mill Road and southwest on Spring Mill Road to Delaware County.

**Philadelphia County:**

In its entirety.